02-10-202-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO.  02-10-00202-CV

 

 


 
 
 In the Interest of C.F., K.F., K.F., J.F.K. and
 J.F., Children
 
 
  
 
 
  
 
 


 

 

----------

 

FROM THE 271st
District Court OF Wise COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          This
is a father’s appeal from a judgment terminating his parental rights to his
five children.[2]  Father challenges the
trial court’s finding that he knowingly placed or allowed the children to
remain in conditions or surroundings that endangered their well-being.  He also
claims that reunification, rather than termination, is in the children’s best
interest.  We affirm.

I.  Sufficiency Standard of Review[3]

          Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. §§ 161.001 (West Supp. 2010), 161.206(a) (West 2008).  Evidence is clear
and convincing if it “will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.”  Id. § 101.007 (West 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007)
(contrasting standards for termination and modification).

          In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the trial court’s judgment with
our own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that the parent violated subsection (D) of section
161.001(1) and that the termination of the parent-child relationship would be
in the best interest of the child.  Tex. Fam. Code Ann. § 161.001(1)(D); In
re C.H., 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record,
the disputed evidence that a reasonable factfinder could not have credited in
favor of the finding is so significant that a factfinder could not reasonably
have formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.

II. 
Endangerment

A. 
Applicable Law

          Endanger
means to expose to loss or injury or to jeopardize.  Tex. Dep’t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re J.T.G., 121
S.W.3d 117, 125 (Tex. App.––Fort Worth 2003, no pet.); see also In re M.C.,
917 S.W.2d 268, 269 (Tex. 1996).  To prove endangerment under subsection (D) of
section 161.001(1), the Department of Family and Protective Services had to
prove that Father (1) knowingly (2) placed or allowed the children to remain
(3) in conditions or surroundings that endangered their physical or emotional
well-being.  See Tex. Fam. Code Ann. § 161.001(1)(D); In re Z.C.,
280 S.W.3d 470, 474 (Tex. App.––Fort Worth 2009, pet. denied).  “Under
subsection (D), it is necessary to examine evidence related to the environment
of the child to determine if the environment was the source of endangerment to
the child’s physical or emotional well-being.”  In re M.C.T., 250 S.W.3d
161, 168 (Tex. App.––Fort Worth 2008, no pet.).  But to support a finding of endangerment,
“the parent’s conduct does not necessarily have to be directed at the child nor
is the child required to suffer injury.”  Id. at 169.  The specific
danger to the child’s well-being may be inferred from parental misconduct
standing alone.  Boyd, 727 S.W.2d at 533; In re R.W., 129 S.W.3d
732, 738 (Tex. App.––Fort Worth 2004, pet. denied).

As a
general rule, conduct that subjects a child to a life of uncertainty and
instability endangers the physical and emotional well-being of a child.  R.W.,
129 S.W.3d at 739.  Drug use and its effect on a parent’s life and his or her
ability to parent may also establish an endangering course of conduct.  Id.;
see Z.C., 280 S.W.3d at 474 (stating that a parent’s “drug use and
drug-related criminal activity may support a finding that the child’s
surroundings endanger his [or her] physical or emotional well-being”).  Further,
a parent’s mental state may be considered in determining whether a child is endangered
if that mental state allows the parent to engage in conduct that jeopardizes
the physical or emotional well-being of the child.  R.W., 129 S.W.3d at
739.  To determine whether termination is necessary, courts may look to
parental conduct both before and after the child’s birth.  In re D.M.,
58 S.W.3d 801, 812 (Tex. App.––Fort Worth 2001, no pet.); see In re
M.R.J.M., 280 S.W.3d 494, 502 (Tex. App.––Fort Worth 2009, no pet.) (op. on
reh’g) (explaining that the “factfinder may infer from past conduct endangering
the child’s well-being that similar conduct will recur if the child is returned
to the parent”).

B.  Applicable
Facts

1.  CPS

Cindy
Martin, a family worker with the Department of Family and Protective Services,
testified that she became familiar with Father’s family in April 2008, after a
transfer from Montague County.  CPS had been previously involved in Montague
County because of domestic violence.  Martin could not find the family to
provide services until the end of May 2008 and thus was unable to provide them
with services.  The first address she had was vacant.  Martin found a second
address, but although she spoke with the family on the phone, made appointments,
and even met Father at her office once, every time Martin showed up at the
second address, the family was not there.  Martin had to contact relatives and
eventually found the family living in a tent in the LBJ Grasslands.[4]

Martin brought the family supplies, food,
clothing, and shoes for the children, who had none.  The children told Martin
that they had left their prior house in such a hurry that they did not take
shoes with them.  Father and Mother told Martin they left their home because
there had been an electrical fire the day of Martin’s scheduled home visit;
however, when Martin had arrived the day of that visit, the landlord told her
the family had just left suddenly.  The family had left their possessions
behind in the home, and it had not burned down.

Martin tried to initiate the same service
plan that Mother and Father were supposed to have been working in Montague
County.  Martin was not able to initiate the services at that time because the
family was not sure how long they would be living there.  But Father and Mother
“verbalized that they would be willing to work something.”  The issues Martin
wanted to work on were getting Father and Mother stable and safe housing,
stable employment, and help with drug abuse and possible mental health issues. 
Martin did not specify what the drug abuse issues were other than to say that
those issues were in the family’s file history.

When Martin found the family, they were about
to be evicted from the Grasslands because they had stayed too long and were not
able to pay the Park Service fee.  The tent was a tight fit, but the family
told Martin that some were sleeping outside or in the car because it was warm. 
She met with them one more time in the Grasslands; she did not have any more
contact with them after the end of July because they had moved again.  She
finally tracked them to the Sunset Inn in Wise County through a relative. 
Father agreed to sign a family group contract to start services with CPS, but
he called back a few days later and said he did not want to do so anymore
because he did not think he could get any family support.  Martin still wished
to offer services, so she set up an appointment at the Sunset Inn for late
July; the family was not there because they had gone to the lake.

The Department closed the case at that time
because it appeared that the children’s basic needs were being met by relatives
even though Father and Mother would not take advantage of offered services. 
Martin never drug tested Father or Mother.

Regina Milner, a specialist and investigator
with CPS, testified that the family was assigned to her in October 2008 because
Father and Mother were arrested for stealing from Walmart; the children had
participated.  Milner met with Father, Mother, and two of the daughters on October
15 at the Sunset Inn.  At that time, Caren and Karmen, the two oldest, had been
placed with an aunt; Janice, the youngest, had been placed with another aunt;
and Joan and Karla had been placed with Father’s father.[5]

Milner got a “frantic” phone call from one of
the aunts saying CPS needed to come pick up Caren and Karmen.  She was tired of
“constant harassment” from Mother and Father about what she was and was not
doing with the children.  When asked if CPS could work with her or if another
family member would take the children, she said no and that “no one with the
family wanted anything to do with” Father.  Nobody was willing to take the
children at that time.  A CPS investigator approved Caren’s and Karmen’s going
back to Mother and Father if Mother and Father passed an oral swab drug test;
they did, so Caren and Karmen were taken back to Father and Mother at the
Sunset Inn.

On the way back to the motel, Karmen was
“very, very withdrawn and quiet,” and Caren “was crying hysterically.”  She
said, “Please keep me.  Please do not take me back to my parents.”  The girls
said they were hungry, so Milner took the girls to McDonalds and then to her
office in Decatur.  The girls told her why they did not want to go back to
their parents.  They said that there was no food a lot of times, their parents
locked them in their room all day when they were crashing from drugs, they had
been slapped on the side of the head, the tent was scary and it flooded,
Mother’s behavior was irrational, and Father was very aggressive.  Sometimes
Father and Mother would call Caren “a fucking idiot” because she has ADHD. 
Both girls said Father and Mother “habitually” used prescription medicines,
such as hydrocodone; Mother introduced Caren to marijuana on one of Caren’s
birthdays, but Father did not know.  The girls also said that Father and Mother
had “crazy, scar[]y, fights.”  They would hit each other in front of the
girls.  The girls said Father and Mother would drink and then crash, leaving
the girls unattended; Caren felt as if she had to parent the younger ones in
those instances.  According to Milner, the children were underweight for their
ages.

The girls worked on a safety plan with Milner
that would allow them to feel safe in the home.  It included no physical
discipline of the children, no fighting between Father and Mother, that Father
and Mother would give the children the medicine their doctor had prescribed for
them,[6] that they would have
appropriate food in the house at all times, that Father and Mother would
refrain from calling each other and the children names and from yelling, that
Father and Mother would not drink alcohol, and that Father and Mother would not
discuss family problems or the CPS case with Caren and Karmen except in
counseling.

Milner presented the safety plan to the
parents at the motel; although they agreed to the plan, Father did not sign it
and was very hesitant.  However, neither parent denied those things had happened
in their home.  Caren and Karmen signed the plan.

Milner then developed a service plan and went
over it with Father and Mother on October 27.  One of the services was to help
Father and Mother get their GEDs; CPS was going to pay for them.  When Milner
left the case, Father and Mother had called the agency but had not completed the
program.  Father and Mother told Milner they had had cases with CPS in the past
but that they were excited this time because Milner’s plan appeared to be
doable for their family.  Milner also referred Father to DARS[7]
because of his back problem, but she was not aware that he followed through
with that.  Another part of the plan was for the family to obtain financial
independence and to go to individual, couples, and family counseling.  Father
and Mother had not followed through on the counseling while Milner was assigned
to their case.  Mother told Milner once that she knew what was wrong with her
and how to fix it.

CPS asked the family to refrain from physical
discipline, refrain from alcohol and drug use, take anger management classes,
have psychological assessments, and meet with Milner once a week to discuss how
to parent an ADHD child.  To Milner’s knowledge, Father and Mother did not
complete any of the services.  Milner asked them to do an evaluation for
substance abuse, which they did not complete.  Father and Mother tested
negative for drugs whenever Milner tested them.

Milner had, during the course of her
assignment to the case, driven Father and Mother to the food bank and
transported them to a meeting for Caren’s school special education program.  She
would also stop by if they needed anything.  Mother and Father were familiar
with community resources, and Mother was already registered with two food
banks.  Although the GED program was in Arlington, Milner had told both Mother
and Father to call her and she would get them anywhere they needed to go.

Milner was the worker who removed the
children.  She had already warned Mother and Father not to alienate the family
members with whom the children had already been placed.  Around this time, she
received a phone call from Mother and Father that they were being asked to
leave the motel, that they would be staying in a tent in the Grasslands again,
and that they felt it was unsafe for the girls to accompany them.  Mother and
Father asked Milner to come pick up the girls.  Milner talked to Father’s
father, who reluctantly agreed to take the older girls for the weekend.  Janice
was also at her grandfather’s when Milner arrived with Caren and Karmen, which
was in violation of the safety plan.  Milner was told that the aunt with whom
Janice had been placed dropped her off to visit her grandfather and never
picked her back up because she had a work conflict and could not care for
Janice anymore.  Mother and Father were not happy with the girls being placed
with their grandfather, but they had no other alternative.  The other relatives
were adamant about not taking the girls because of the “violent calls” from
Mother and Father.  Milner sensed that the calls were not because of abuse
concerns but were because of Mother and Father “wanting to be in control of
their [kids’] lives.”  At the time, Milner had Father and Mother sign a safety
plan.

When Milner dropped off Caren and Karmen at
their grandfather’s house, she explained to them the difference between normal
discipline and conflict.  However, the house was crowded because it was a two
bedroom duplex.  Milner and her staff handled several phone calls from the
grandfather over the weekend; he could be heard calling the girls names and
screaming.  Milner pointed out that he said he would not do that, but he said
the girls would not listen to him.  Caren and Karmen had taken on the role of
caregivers to the younger girls and were questioning what their grandfather was
telling them.  There was a lot of conflict.

That next Monday, Milner went back to the
Grasslands to try to find Father and Mother; but she could not find them.  She
then went to the motel to serve the removal papers, and Father and Mother were
there.  Mother acted very emotional and then slammed the door; Milner and
Father talked about the fact that no other relative would take the children,
but Father never asked for the children back.  Milner took the children into
CPS custody that day; CPS then transferred the case to caseworker Laura
Patterson.

Laura Patterson was assigned to the case in
December 2008.  Patterson felt she had a “pretty good” relationship with the
girls even though at first they were guarded and did not open up much.

According to Patterson, Caren and Karmen were
“pretty verbal” with her about Mother and Father’s fights.  These fights
happened frequently.[8]  They said furniture was
broken, and the police would have to come out and separate the parents.  Caren
felt that she had to protect and be the caretaker of her siblings.  Caren and
Karmen expressed fear of living in the home.  Caren had used drugs with Mother
and had also found paraphernalia under her parents’ bed.  Karmen said she had
seen both her parents use drugs.

Caren talked about stealing chicken from
Walmart and about pumping gas and not paying for it when she was with her
parents.  Both Caren and Karmen had talked about an incident during which the
family’s car was being repossessed, and Father asked Caren to sit on top of it
so that it could not be towed away.

According to Patterson, the children did not
ask to go with Father after their visits, nor did they ask when they were going
to see their parents again.  Patterson said this behavior was unusual; the
majority of the children on her caseload would cry at the end of visits and
would call her regularly wanting to know when their next visits would be.

          Father
passed every drug test that he showed up for but one; for the one he did not
pass, he provided paperwork from the emergency room showing that he had been
there the night before with kidney stones.  She had never seen Father appear to
be under the influence of drugs.

          After
the girls’ last visit with Father in April 2010 (they had not seen him since
January), the foster parents reported that Caren’s behaviors had gotten worse,
Karmen had shown more anxiety than she had previously, and Janice “had
increased in some particular behaviors.”

2.  Counselors

Dr. Roger Doss, a licensed professional
counselor, testified that he had been providing counseling for the four
youngest children for almost a year; they had been in three different foster
homes during that time.  According to Dr. Doss, Janice, who was six years old
at the time of trial, was experiencing a lot of anxiety, bedwetting, and
defiant behavior.  The next oldest, Joan, who was nine years old at the time of
trial, was having issues with defiance and lying.  Karla, ten years old at the
time of trial, was having issues with anxiety and stress when Dr. Doss first
started seeing the children.  And Karmen, thirteen at the time of trial, “was
having a lot more defiant issues, not being very compliant.”  His initial
impression of these four children was that they were “kind of disconnected,
real anxious.”  Behaviors they exhibited were “screaming, lying, being defiant,
[and] not following guidelines.”  They had issues with acting out in school as
well as academic challenges.”  The girls also had some social and developmental
issues that Dr. Doss attributed mostly to the anxiety, but they did “interact
with each other fairly well.”

Dr. Doss testified that Karmen had problems
with aggressiveness and anger, that she was “not very forthcoming with what’s
going on emotionally,” and that she liked to engage in power struggles.  She
had hit her first foster father.  Foster parents had reported that she
sometimes was aggressive with her sisters when she did not get what she wanted.
 Karmen would not talk much about life with Father except to be dismissive or
say, “it wasn’t that bad.”  She would not talk about whether Father used drugs
and when questioned about Father and Mother’s fighting, she would say, “Oh,
they just got mad and my mother left.”  Karmen did admit that the family did
not have much food and would have to sometimes fish for food, but she would not
elaborate.  Karmen was “very mistrustful [and] very guarded” in her play and
interaction with Dr. Doss.

Dr. Doss said that Karla was “very anxious”
and struggled more in school than Karmen.  She tended to worry a lot.  She was
not as aggressive and tended to play the victim role; she was always trying to
make things better.  Karla talked about her parents fighting and something
being thrown; she was scared and anxious when her parents fought.  She talked
about her family living in a tent and how she wanted her own house someday; Dr.
Doss believed those kinds of statements showed Karla felt unsettled in her
living conditions with her parents.  She told Dr. Doss that she liked living in
the tent sometimes, except when it was cold or rainy.  She would not talk about
whether her parents used drugs, but she did acknowledge that the family did not
have much food.  Dr. Doss thought that Karla was a grade behind in school.  In
her play and interaction with Dr. Doss, Karla seemed to be “wanting to feel
settled.”

Dr. Doss reported that Joan had had “major
issues with . . . lying” and schoolwork.  She “look[ed] to avoid any uncomfortable
emotions” and engaged in avoidance of conflict.  Joan told Dr. Doss that Mother
and Father fought, “that they would sometimes throw things,” and that one time
“someone from the church came.”  Joan confirmed to Dr. Doss that the family
sometimes did not have enough food and had to eat beans or catch fish to eat. 
Joan was very influenced by Karmen and would sometimes join in Karmen’s
aggressive behavior.  When asked about being adopted into a “forever home,”
Joan responded that she hoped the family had a dog and would talk about some of
the things she wanted in such a home.  Joan liked to be in a position of
feeling powerful and in charge in her play.

Janice “tend[ed] to have more things going on
in her head” and was very imaginative.  She tended to live more in a fantasy
world.  Janice acknowledged that her parents fought, but she would not
elaborate.  Her foster parents reported to Dr. Doss that Janice had quit wetting
the bed but would still occasionally have screaming fits when she did not get
her way.

Dr. Rhonda Polakoff assessed the oldest
child, Caren, in January 2010 when Caren was fifteen.[9] 
As part of the assessment, she interviewed both Caren and Caren’s foster
parents.  Caren’s foster mother was very concerned with Caren’s “level of
detachment”; Caren engaged in destructive behaviors, but Caren did not seem
very concerned about those behaviors.  The foster mother was Caren’s fifth, and
she said that although Caren was cooperative and pleasant, she was very
detached and aloof and “there was very little communication.”  Caren had
academic delays and did not participate much in school activities.

When Dr. Polakoff interviewed Caren, she was
distant, “very detached,” and depressed.  Caren was very formal and
robot-like.  Caren reported “a long history of substantial abuse and violence
in the home and oftentimes not having a car, not having enough food to eat, [and]
having to steal to survive.”  Caren said times were happier in the past and
that when she and Karmen were little, they were locked in a room all the time,
but they had toys and food.  Caren did not know such a thing was wrong until
she was ten.  Dr. Polakoff described Caren as being so traumatized that she had
no awareness of how traumatized she had been.  Caren had been to the
psychiatric hospital twice since being in foster care.

Caren reported to Dr. Polakoff that Father had
“tried to drown her mother in the pool.”  Sometimes she tried to defend Mother,
but Father “would subsequently punch her in the face.”  She also said that
Father “pushed [Mother] out of a car going 80, and it was scary.  [The
children] thought she died, but . . . she came home all scratched up.”  Dr.
Polakoff said she had no idea if what Caren said was true or not, but “she was
reporting [these incidents] as if they were her . . . realities.”  Dr. Polakoff
said that Caren’s functioning had definitely been impacted by the violence
between her parents.

Caren also told Dr. Polakoff that the girls
missed a lot of school because they never had clean clothes to wear.  Caren did
not show any emotion about having to miss school, however.  Dr. Polakoff tested
Caren’s IQ, which was 74; she also tested her academic skills, which were
“very, very weak.”  Psychological testing showed that Caren “struggled with
significant insecurities, troubles with self-esteem, . . . difficulties with
being able to trust[,] . . significant emotional behavioral
issues, . . . significant depression[,] and self-destructive behavior.”  Her
person drawing showed problems with trust and attachment.

Dr. Polakoff gave Caren’s foster mother a
questionnaire in which she indicated that Caren had severe symptoms of
depression and that Caren also displayed disruptive behavior disorders, such as
experimenting with drugs and sexual promiscuity, and breaking the rules at
school.[10]  Dr. Polakoff diagnosed
Caren with “[s]evere reoccurring depression, post-traumatic stress disorder,
disruptive behavior disorder, borderline intellectual functioning, and
borderline independent personal traits.”  The “borderline independent personal
traits” are “characterological problems,” i.e., low self-esteem, poor social
judgment, poor impulse, and not being able to modulate her emotions.  According
to Dr. Polakoff, these traits occur when a person experiences trauma early and
his or her personality and character does not adequately develop.  For example,
the foster mother had reported that when Caren was in a cast, she cut it off so
that she could run away.  Dr. Polakoff stated that if Caren were engaging in
cutting behavior, it would be a sign of her poorly-developed behavior and
inability to cope with “evil feelings.”

Dr. Polakoff admitted on cross-examination
that some of Caren’s personality traits, in particular the depression, could be
genetic.  She also agreed that the instability of Caren’s foster-care situation
could have impacted Caren’s functioning.  She agreed that Caren was probably a
difficult child to care for and that someone would have to be very committed to
her care.  She thought waiting six months to a year before deciding on a
permanent placement for Caren would create a lot of anxiety for her.  Dr.
Polakoff recommended that every effort should be made to place Caren in a
foster home with psychiatric intervention and counseling, but she feared Caren
would end up in a residential treatment center “because her functioning [was]
so impaired that she [could not] be treated on an outpatient basis.”

Dr. Polakoff stated that, unlike Caren’s depression,
the PTSD and disruptive behavior were not genetic.  According to Dr. Polakoff,
the personality issues were from problems with early childhood, not just from
being in the foster care system.  Although she could not confirm with accuracy
whether what Caren said about her childhood had actually happened, Dr. Polakoff
did testify that the foster mother said the same thing and that Caren’s
functioning was “so severely impaired that it would suggest that there has been
a long history of trauma.”

She admitted that Caren’s problems could also
be related to having a fire in the home, being homeless, and having parents
without jobs, and that she could be engaging in self-destructive behavior for
attention.  But Dr. Polakoff said Caren’s behavior was worse than a normal
teenager and very extreme.

Marti Riedel, with CPS therapy services, testified
that she provided therapy to Caren.  Caren had been placed in a foster home
where she was separated from her siblings.  Riedel was provided with a
diagnosis of attention deficit disorder, which is the initial diagnosis she
used in treating Caren.  She would speak with Caren’s caregivers at every
session.  Caren was very responsive to Riedel.

According to Riedel, Caren “is a fairly
bright child.  She’s academically delayed.  She has a very low self-esteem. 
She has very poor problem-solving and decision-making skills.  She has the
capacity for great improvement, but doesn’t have the motivation at this time to
achieve that.”  Caren would accept consequences for her behavior but would
minimize her culpability for it.  Caren was “very, very savvy with her peers”
but functioning on a fourth or fifth grade level academically.  She had been
expelled from school twice and was in danger of being sent to an alternative
school if she were expelled again; the foster parents could not take her to the
alternative school, so Caren would have to move again.

Caren told Riedel that her parents used
drugs, were in trouble with the law because of their drug use, and that Caren
used drugs when she was with her parents.  She also told Riedel that her
parents were not around a lot; Riedel got the impression that Caren was with
friends a lot or out on the streets unsupervised doing what she wanted.  Caren
engaged in cutting behavior; Riedel thought Caren wanted people to see what
kind of pain she was in.  She pierced her belly button with a tack and pierced
her skin at school with a stolen needle.[11]  She told Riedel she
wished her parents had done better and that she could go home and they could be
a typical family.

At the time of trial, Caren was in Millwood
Hospital; she had been expelled from school for fighting, and the teachers were
concerned that Caren was using drugs at school.  It was Caren’s second
hospitalization during foster care.  Caren was “extremely academically delayed”
because she had not gone to school regularly when she was with her parents and
because she had had to move schools each time she moved to a new foster home.

At the time of trial, Caren was sixteen and
failing the eighth grade.  Riedel thought Caren could catch up, but she said Caren
had a “who cares” attitude.  According to Riedel, Caren truly believed she was
stupid, which Riedel said was simply untrue.  Caren had told Riedel that Mother
did not finish the eighth grade.

3.  Father

          The
State called Father to testify.  He said that he had been homeless for about
year and a half.  He had been married to Mother for seventeen years but had not
seen her for three months before trial.

          Father
had been the subject of a CPS referral for neglect when Caren was about three
years old; the case was closed.  He had also been the subject of a referral in
Decatur for “[n]ot watching [the] children [Caren and Karmen].”  That case was
also closed.  A third referral was made in Bowie after all five children had
been born and Janice was about five.  According to Father, “[N]othing really
came out of it.  It kind of lead into this case.  [CPS] came over and visited a
few times.  No . . . services were really offered.”  There was a period of about
one month when Mother could not be around the children.  The main allegation of
the third referral was that Mother did not watch the children while Father was
at work.  The referral was from Father’s father.

          The
last referral was about a year later, in 2008.  According to Father, he and Mother
were homeless and called CPS themselves.  They told CPS that they could no
longer take care of their children and that they needed help.[12] 
The family was being evicted from the Sunset Inn, and Mother and Father were
moving back to the lake.[13]  CPS removed the
children; according to Father, they did not offer services except for a housing
list, but the family was too large for any of the listed places.  Father and
Mother had tried to get family to take the children, but Father’s father was
too old, and “[t]here was some . . . fighting between [Father’s] sisters over
the other children.”  Father was working part-time, but Mother was not working.

          Before
the phone call to CPS, the entire family had once before lived at the lake on
the LBJ Grasslands; after the removal, Father and Mother moved back there. 
Everyone, including all the children, slept in a tent and took baths in the
lake.  The family was getting food stamps during that time of about $800 a
month.  According to Father, neither he nor Mother could find a job because the
economy was so bad.  A CPS worker visited the family once at the lake, brought
them a cooler, and told them they were in violation of the law.

          Father
testified that before living at the lake, the family had lived in Cooke County;
the house they were living in burned down, which is how they ended up at the
lake.

Father’s
car was often not working, and the bus did not stop by the area where they were
living, so Father and Mother had to talk to the “people that ran the bus line”
to get the children picked up for school.  Father admitted that the children
had problems with school attendance and had attended several schools.  Father also
admitted that some of the children had problems with school but others “did
real well.”  Caren failed seventh grade twice, but Father was not sure why. 
Also, Joan failed one year, but Father did not know why.  The other girls were
in their appropriate grades.  At least one of the schools had notified Father
and Mother that the children were behind because of lack of attendance.  Father
tried to make sure the children made it to school more often.  Mother was the
primary caregiver, however, especially when Father was working.

          Father
had been arrested for domestic violence when he and Mother were living at the
lake;[14] he slapped her, and she
pulled his hair, scratched him, and slapped him.  Father did not press charges
against Mother, but he was convicted of assault family violence in 2009 on a
plea of no contest, and he was still on probation at the time of trial.  Although
Father denied the allegations in the police report, it stated that Father pulled
Mother out of the tent by the hair, straddled her, sat on top of her, and
struck her five times in the head.  Mother also alleged that Father had choked
her for a few seconds.

          According
to Father, he had never used drugs.  CPS gave him two drug tests, and only one
was positive for painkillers.  He had taken the painkillers for kidney
surgery.  At the time of the first CPS referral though, when Caren and Karmen
were little, Father would drink about one six-pack of beer a weekend.   He had
used illegal drugs when he was a teenager but not since the children had been
born.  Father had either seen Mother use marijuana after the children were born
or Mother had told him about the marijuana use.  He denied that Caren had used
drugs at home.  He did miss a couple of drug tests, but he explained that he
was just tired of taking so many drug tests that were always negative.

          Father
admitted taking the children to Walmart two times to eat chicken that they did
not pay for; he admitted it was not right and said he was not trying to train
the children to steal things.  He was simply at the end of his rope and had
nowhere else to turn.  When it happened, the food banks and churches were
closed for the evening, and Father’s and Mother’s fathers had “turned [them]
down.” 

          Father
admitted that when the family was living in the tent, the girls did not get
regular doctor’s visits.  He acknowledged that the girls had been negatively
impacted by his inability to obtain a job or home.

          According
to Father, Mother did not have a history of mental illness, but in the last
year before trial, he had seen her exhibit aggressive behavior and talk about
things that made no sense.  Her “thought patterns were all different.”  He did
not see this behavior in Mother until the children were placed in foster care.

C.  Analysis

          Caren
reported to her therapist, and Caren and Karmen both reported to Milner, that
both parents had used drugs and alcohol and that the girls had been locked in a
room afterward.  Father’s negative drug tests do nothing to contradict this
evidence, especially considering the evidence that he missed two tests and that
he and Mother evaded Milner when she tried to visit them at their home in Cooke
County.

Both
Caren and Karmen reported domestic violence in the home.  Although appellant’s
brief glosses over this aspect of the evidence, it is important.  Caren and
Karmen were both scared of their parents’ fights, which at least on occasion,
according to Caren, involved them throwing objects and hitting each other. 
Caren reported “a long history of violence” in the home, which included Father
pushing Mother out of the car at high speed.  Although there is less evidence
about the effect of this behavior on the three youngest girls than its effect
on Caren and Karmen, that is likely attributable to Caren’s and Karmen’s being
older and assuming protective roles toward their younger sisters.

Although
CPS closed its case when the family was intermittently living in the Grasslands
because the children appeared to have their basic needs being met, all of the
children had been involved in stealing food on at least two occasions, and
Caren and Karmen reported frequently going hungry.  According to Milner, Mother
and Father knew how and where to obtain services, such as food; thus, a fact
finder could have reasonably formed a firm belief that the children sometimes
went hungry because of Mother’s and Father’s drug habits.

Accordingly,
we conclude and hold that a factfinder could reasonably form a firm conviction
or belief that Father violated subsection (D) of section 161.001(1); therefore,
the evidence is factually sufficient to prove this ground for termination.  See,
e.g., In re C.J.O., 325 S.W.3d 261, 265–66 (Tex. App.––Eastland 2010, pet.
denied).

III.  Best Interest

A.  Applicable Law

          There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008).

The
following factors should be considered in evaluating the parent’s willingness
and ability to provide the child with a safe environment:

(1)  the child’s age and
physical and mental vulnerabilities;

 

(2)  the frequency and
nature of out-of-home placements;

 

(3) the magnitude,
frequency, and circumstances of the harm to the child;

 

(4) whether the child
has been the victim of repeated harm after the initial report and intervention
by the department or other agency;

 

(5) whether the child
is fearful of living in or returning to the child’s home;

 

(6) the results of
psychiatric, psychological, or developmental evaluations of the child, the
child’s parents, other family members, or others who have access to the child’s
home;

 

(7) whether there is
a history of abusive or assaultive conduct by the child’s family or others who
have access to the child’s home;

 

(8) whether there is
a history of substance abuse by the child’s family or others who have access to
the child’s home;

 

(9) whether the
perpetrator of the harm to the child is identified;

 

(10) the willingness
and ability of the child’s family to seek out, accept, and complete counseling
services and to cooperate with and facilitate an appropriate agency’s close
supervision;

 

(11) the willingness
and ability of the child’s family to effect positive environmental and personal
changes within a reasonable period of time;

 

(12) whether the
child’s family demonstrates adequate parenting skills, including providing the
child and other children under the family’s care with

(A) minimally
adequate health and nutritional care;

 

(B) care, nurturance,
and appropriate discipline consistent with the child’s physical and
psychological development;

 

(C) guidance and
supervision consistent with the child’s safety;

 

(D) a safe physical
home environment;

 

(E) protection from
repeated exposure to violence even though the violence may not be directed at
the child;  and

 

(F) an understanding
of the child’s needs and capabilities;  and

 

(13) whether an
adequate social support system consisting of an extended family and friends is
available to the child.

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.

          Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include

(A)        
the
desires of the child;

 

          (B)     the emotional and physical
needs of the child now and in the future;

 

(C)     the emotional
and physical danger to the child now and in the future;

 

(D)     the parental
abilities of the individuals seeking custody; 

 

(E)     the programs
available to assist these individuals to promote the best interest of the
child;

 

          (F)     the plans for the child by
these individuals or by the agency seeking custody;

 

(G)     the stability
of the home or proposed placement;

 

(H)     the acts or
omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and

 

(I)          
any
excuse for the acts or omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976).

          These
factors are not exhaustive.  Some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

B.  Applicable Facts

1.  The Girls’ Needs

Dr. Doss supervised a visit with the girls
and Father.  Dr. Doss thought the visit went “exceptionally well” and that
Father related well to each girl.  Father was emotionally engaged with each
one.  The girls were glad to see him, hugged him, and were very responsive. 
Dr. Doss did not witness anything inappropriate and was impressed.  Dr. Doss
had talked to Father before the visit and asked him not to promise the girls
anything because Dr. Doss was concerned that they had “been like a Yo-Yo.” 
Father understood and complied.  Dr. Doss saw the four younger girls again
after the visit; Karmen did not say much other than “it was all right.”  The
other three said the visit was good, but they were “kind of emotionally
detached” about it.

Dr. Doss thought the girls needed to be
placed somewhere where they would feel settled and permanent.  Dr. Doss thought
that to achieve this, Father’s relationship with the girls should be terminated
because he did not think they could “really connect with the stable place they
are with if they have that dynamic where their father is still in - - kind of
in a part-time or in that kind of a role.”  Dr. Doss would be concerned even if
Father were able to eventually provide this type of stability because he would
be having to work so much that the girls would essentially be raising
themselves.  Dr. Doss agreed that losing the relationship with Father would be
damaging but that more damage could be done by the disappointment the girls
would experience if they thought Father would be able to take care of them and
then Father was not able to do so.  In response to questioning, the girls would
tell Dr. Doss they wanted a relationship with Father, but “then they [wouldn’t]
talk more about it.” They engaged with Father more than Dr. Doss.

          In
response to questioning from Father’s counsel, Dr. Doss said that any
reunification with Father would have to be on a gradual basis and that Father
should have counseling focused on how to interact with children who have the
same kinds of issues that the girls face.  Dr. Doss characterized the girls as
suffering from neglect.  He said the girls often had a flat affect and that
they were all “kind of disconnected.”  According to Dr. Doss, the girls needed
to be settled “sooner rather than later.”  He reiterated that in his opinion,
termination was the best option for the girls to obtain the stability and
permanence they need.  The girls were doing well with the foster family they
were living with at trial, had decorated their rooms, and had expressed to Dr.
Doss that they enjoyed living in the home.

          The
trial court asked Dr. Doss about the effect on the girls when their mother
terminated her rights.  Dr. Doss said their reaction was “[v]ery little.”  He
did not think there was a goodbye visit and could not recall whether the girls
even told him.

          The
youngest four girls were in their first foster home for four or five months.  They
had to move from their first foster home because the foster parents were
getting a divorce.  Their move had nothing to do with the children’s behavior. 
The second foster parents refused the placement because Joan was exhibiting
such defiant behaviors that it “was wearing the foster parents out.”  At the
time of trial, the girls had been in a fourth foster home for almost three
months.

Caren
was in a foster home by herself because of her behavioral issues and because
she initially requested not to be placed with the rest of her siblings.  She
got to see her sisters every other week for two hours.  Caren was moved every
two to three months because of “[h]er behavior and her cutting incidents  . . . that
would ultimately land her in the hospital.”  At the time of trial, she was on
her third hospital stay and fourth foster home.

Patterson
still believed that it was in the children’s best interest for Father’s rights
to be terminated:  

These girls have
lived in constant chaos, in constant fear with no permanency.  They need
permanency now, not six, seven, eight, nine months at the end of this program.

 

          We have no guarantees at this point
that he is going to have employment and stability at the end of that time.

 

          We need to get these girls in an
adopted home, where they can move on with their lives.

 

          Patterson
said there is a more limited pool of foster homes than adoptive homes; adoptive
homes can be found nationwide.  Patterson testified that the foster home the
four youngest girls were currently living in was licensed for adoption as well,
but the family was not sure they could take Caren because of her destructive
behaviors.  At the time of trial, the girls were able to visit with Caren once
a month.  Patterson said there would be more flexibility between adoptive
parents for visitation options.  If Caren could not be adopted, she would most
likely be eligible for the PAL program, which would help her graduate and get
her into a trade or vocational school if she could not get into college; if she
got into college, she would have a full scholarship.

          Dr.
Polakoff testified that Caren needed a “very high-level structure” with
“extremely high-level supervision due to her high-risk behaviors.”  Because
Caren presented herself as cooperative and pleasant, a caregiver would need to
be firm and be able to see beyond Caren’s outward appearances.  Dr. Polakoff
would not recommend leaving Caren with younger, smaller children; in fact, she
recommended twenty-four hour supervision.

Caren needed a placement “with lots of
supervision and support [and] lots of appropriate nurturance and encouragement,
as well as . . . consequences of her behavior.”  Caren needed someone who could
reinforce good behavior and help guard against bad decision making.  Riedel
thought Caren would not improve until she established some permanence.  Her
current foster parents were committed to taking Caren back after she was
released from Millwood.  However, Riedel did not know whether they would adopt
Caren; she thought they were questioning their ability to help Caren because of
all the trouble they had had with her.

Caren loved her parents and wanted to be with
them, but she did not think it would work out and worried about being placed in
foster care again.  She missed being with her sisters, and Riedel thought she
needed regular visits with them.  Because of Caren’s difficulties, she needed
to be with a committed family, like her foster family, who was in “intensive
psychological therapy.”  She said it would be important for Caren to know that Father
loved her and was working hard to change, even if Caren was adopted by someone
else.  Riedel said that if she had a guarantee Father could provide adequate
care and supervision, role modeling, nurturing, and educational support, Caren
would not be harmed by waiting a few months to be with him.  But without any
certainty, she was worried about the level of Caren’s anxiety from the
waiting.  Riedel said Caren would need a parent who was involved at school,
helped with anger management, and was extremely observant to deal with the
cutting behaviors.  The parent would need to have skills beyond what CPS
typically sees in cases in which it is involved.  She opined that someone who
could not complete a service plan could not take care of Caren.

When asked by the court how Caren would feel
if the judge gave Father a second chance and he messed up, Riedel said, “I
don’t think it would surprise her that much.  I think that’s what she expects. 
She expects the worst to happen in every situation at this point.”  Riedel felt
that Caren would try to reconnect with her parents when she was old enough; she
said all her teenagers are aware of that possibility.

          The
children’s CASA advocate testified that termination was in the children’s best
interest.

2.  Father’s Situation and Parenting
Abilities

When
Patterson first met with Mother and Father at her office, she presented them
with a service plan.  At that time, she had fairly consistent contact with
Father and Mother.  She assisted them in setting up some of the services. 
Mother was not compliant with the drug testing and tested positive for
marijuana on two of the tests she took.  Father missed two or three tests. 
Mother and Father were discharged from family therapy for failure to show up to
appointments; Mother went five times, but Father went to only two.  Mother did
not go to individual counseling, but Father went to eight of ten sessions.[15] 
Prior to trial, however, Father called Patterson and said he wanted to start
therapy again; he started two weeks before trial.  Father was consistent in
visiting the girls.

The
Department changed its plan to adoption because it appeared none of the
children could be returned to Father or Mother, and there was no potential
family placement.  Father’s father had passed away, and his one sister lived in
California and could not take the children.  At one point, the Department had
been looking to place the children back with Father only; Father was working at
least part of his service plan and had a part-time job that he thought would
lead to a full-time job.[16]  But he lost that job,
and the disability he thought he would be getting did not come; at that point,
which was in September 2009, Father stopped communicating with CPS.

Father
still said he wanted the girls back.  The only time he talked about
relinquishment was in late December 2009 and January 2010 after Mother signed her
affidavit of relinquishment; Father’s father had just died and charges were
pending against Father for the violence against Mother.  He stated positively that
he wanted to relinquish his rights at the memorial service for his father;
Patterson discouraged him from doing so at that time.  Father told the three
youngest girls and then Caren and Karmen together that he had decided to
relinquish his rights; he did not see them again until April 2010 when he had
decided he did not want to relinquish his rights.

At
the time of trial, Father was working in a program run by U-Turn Ministries,
cooking, driving, doing construction work, mowing, working in the food pantry,
and feeding the homeless.  He was not yet earning money but anticipated that he
would be in about a month after the trial.  He was not sure how much he would
be paid.  The program would be for eight months to one year, depending on the
individual, and Father had started the program in January 2008 about four
months before trial.  He was referred to the program by the probation
department, but he was participating in it voluntarily. 

          Father
knew that he could not have his children back at the time of trial, but he
asked “for some time.”  If the trial judge were willing to do that, he would
get a job and “take care of [his] children the way [he] should.”  According to
Father, he would be allowed to get a job in a couple of weeks after trial.  The
ministry had helped him deal with depression and guilt that had kept him from
fulfilling his service plan requirements.  He said that he would be better
about contacting his caseworker and “comply in every way possible for my
family.” According to Father, the ministry would be his support system, would
provide transportation if necessary, and would “help in every way possible.”

          Father
planned to continue working for the ministry even after he was released from
the program.  The ministry supported several businesses; Father wanted to start
his own new business through the ministry.  He thought he could make between
$2,000 to $4,000 a month.  He also planned to continue to live there until at
least four months after the trial; there were eleven to thirteen men living
there, but Father did not have his own room or his own house.  He agreed the
arrangement would not be suitable for the girls; all of the men in the program
were on probation.  Father’s long-term goal was to get his own house somewhere
in the Bowie or Crafton area, depending on what kind of money he would be
making.  He did not know how much he would make, “but it would be sufficient to
care for the girls.”  Father could not guarantee that in four months he would
have a job or how much he would be making.  His backup plan if the ministry
would not or could not help was to find a daycare that would accept the
children for long periods of time during the day.

          Father
talked to Mother before she relinquished her rights.  She told him she was not
mentally stable enough and could not deal with any more than what they had
already gone through.  Father was surprised though; he thought Mother would
want the children back and work her plan.

Father
said he was prepared for the responsibility of parenting all five girls without
the support of his wife.  Father agreed that the children needed permanence and
stability.  He testified that he had a bond with the girls and they needed to
be with him.  Also, if they were with him, all five could be together; at the
time of trial, Caren and Karmen were not living with the younger three
according to Father.  Father knew he needed to be more observant with the
teenagers and be more of a boss.  He was willing to do “whatever it takes.”  He
felt he was better able to do so at the time of trial because he had a better
support system and was more capable mentally.  However, Father admitted that he
did not know for sure where he would get a job and had no concrete plans.

          Father
was concerned about the children being in CPS’s care because Caren had been in
a mental institution for four months.  He was not sure how that had impacted
her.  He understood that she did have mental health issues, and he was prepared
to get her “counsel[ing], medication[,] whatever it takes.”  He felt that being
in foster care was negative for Caren because she had tried to jump out of a
window and broke one of her ankles, and her behavior issues had been
compounded.  He felt that through his work at the ministry he had developed the
tools as a father to help her and that it would be positive for her to be back
with him and her sisters.  He also thought being away from Caren had impacted
Karmen negatively.

          Father
believed that Karla had some educational issues that needed to be addressed,
but he was not sure what they were.  She was very close to Caren and very much
like her.  Father was willing to work with CPS and the school system about
Karla’s educational needs.  He wanted all the girls to go to college and was
willing to “put in the time” with them necessary to make that happen. Father
testified that he worked sixteen to eighteen hours a day at the ministry,
cooking for others and driving them.  He felt he had learned how to be
attentive to the needs of others.  He was ready to discipline the girls as
necessary, which he understood to mean age-appropriate grounding, time outs,
and taking away privileges.  He acknowledged making mistakes in the past by
being a passive parent.

          Father
attended regular visits with his children.  He told them at one of the visits––for
their grandfather’s memorial service––that he was going to relinquish his
parental rights.  He told one of the girls to get on with her life, go to
college, not to try to look up him or Mother, and excel in life.  According to
Father, he told the girls he did not have a choice because he was “probably
headed to jail.”  At the time, Father was behind on paying his probation fees;
he had been told “it didn’t look good” for him.  He felt as if he had no other
option.  But the day after the visit, another person in the probation office
told Father that they were not prepared to arrest him and had not issued a warrant
for his arrest. 

          Kevin
Alexander, the pastor and director of U-Turn Ministries, testified that he
first became acquainted with Father in January 2010.  He met Father at the
probation department and decided he was a good candidate for the program, which
Father volunteered to join. 

          Alexander
described the program:  for the first ninety days, the ministry would teach participants
the word of God, how to work, and how to submit to supervisory authority. 
After someone had been with the ministry awhile, the ministry staff taught him
how to do job interviews, how to handle conflict in the workplace, and how to
deal effectively with difficult situations instead of turning to alcohol,
drugs, or giving up hope.  Attendees were not free to come and go at the
beginning of the program because people who have problems with alcohol and
drugs can fall back into using them too easily.  Attendees had to abide by
strict rules; their day began at 5:30 a.m. and ended at 10:30 p.m.  The men
spent the morning doing devotions and Bible study, the afternoons working at
area churches, and the evenings in Bible study.  The ministry participants did
community work, such as working with food banks.  Staff encouraged the
attendees not to associate with people or friends that could lead them into bad
behavior.  Staff tried to work around individual circumstances such as parole,
probation, or CPS involvement; in other words, if someone had to make extra
phone calls or had appointments, they tried to work around that.   They did
whatever they needed to do to help the men succeed.  The men earned extra work
privileges as they moved through the program.

          Father
was doing “great” in the program; he had given up hope when he arrived, but he had
started changing and was getting involved more.  As Alexander described, “He’s
going somewhere.  He’s got a vision.  He’s got a purpose.  He’s got a plan, and
he’s headed somewhere.”

          Alexander
said that some come into the program and try to manipulate the system; the
program makes adjustments for those types of situations.  Alexander did not
think Father was one of those men.

          As
for the future, Alexander said that after six or nine months in the program,
the men would start working in one of the ministry’s business groups, either
landscaping or in a scrap business or another business.  The men would be able
to earn money; in the last three to six months of the program, they would be
helped in finding a full-time job.  Some would stay with the ministry and work
there; the ministry taught the men to save their money and helped them get an
apartment and eventually into full-time housing.  Alexander said the ministry
asked for at least a year’s involvement, but some chose to stay longer.  Alexander
estimated that it would be another six months from the date of trial (end of
October 2010) before Father would be able to look for a full-time job.  He
thought Father had the skill and ability to find a full-time job.  As an
example, he said Father was very skilled at organizing and overseeing the inventory
for the food pantry.

          Alexander
told the court that when Father started looking for full-time work, the
ministry would help him with getting housing, doing what he needed to be able
to do to take care of the kids, and making a budget plan.  He also said the
ministry would help Father with visiting the kids and attending meetings
required by any service plan that the trial court might order instead of termination. 
The ministry would also help him complete his probation requirements. 
Alexander believed that Father genuinely cared about the children.  Alexander
said they did not have anything in place at that time to help out with getting
the girls back, but that he had people willing to help out.  According to
Alexander, “[t]he service will continue when he gets his kids, just like it did
before he got his kids.”  Alexander said the ministry would continue to support
Father even after he was finished with his year commitment and help him learn
to be a good parent.  Alexander said Father was committed to the girls, and the
court had more reason to trust Father now than it did before.

          Alexander
testified that if Father did not find a job until the next January, the
ministry would still pay him for his part-time work, feed him, clothe him, and
house him.  When someone was ready to live on his own, the ministry would help
find him housing.  At the time of trial, there were eight to ten men living in
the ministry’s home; not all of them were on probation.  Most of them had been
involved with drugs or alcohol, or they were homeless.  Father told Alexander
that he had had a problem with alcohol.  U-Turn did not provide AA or NA
meetings or psychological counseling; all of the curriculum was based on Bible
study.  Alexander did not learn about the domestic violence until he came to
court about a month before trial although Father may have mentioned needing to
go to a meeting related to his probation.

          Father’s
probation officer testified that he had not been paying fees while he was in
U-Turn Ministries, nor had he been taking his required batterer’s classes. 
However, the probation department would not revoke him while he was
participating in U-Turn.  He would have to make up those fees and take his
classes once he had completed the program.  Father had been reporting every
month and was “doing good.”  The probation department director testified that
even if Father was revoked, the maximum sentence that could be assessed was 365
days.

C.  Analysis

          All
of the girls’ counselors testified that their need for stability and permanency
was immediate and paramount.  Caren, especially, needed someone with advanced
parenting skills and an adequate amount of time to supervise her and be
involved with her schooling and treatment.  At the time of trial, Father was
not even able to start looking for work or stable housing for at least a few
months, and he had not worked his service plan.  Although there was evidence
that he had made positive personal changes in his life by the time of trial and
was willing to begin working a plan again, there was no evidence of any changed
or enhanced parental capabilities such as would be required to care for five
children on his own,[17] one of whom would
require one-on-one attention and who, according to one of the counselors, was
not supposed to be unsupervised around her sisters.

          Father
did not have any support system other than the ministry to help him care for
the children, and although Alexander promised to help Father with the girls in
the future, there were no concrete plans for their care.  CPS had a long
history with the family, and there appeared to be a long pattern of neglect
based on drug and alcohol usage by Father and Mother.  Caren and Karmen were
afraid to go back to their parents before their removal, and the girls were
ambivalent about being returned to their parents in the future.  Even
considering that the girls had been in several foster homes in a short time,
the evidence shows their best chance for the stability and permanency they
needed was through termination and adoption (or the PAL program for Caren)
rather than waiting for up to a year for Father to finish working the
ministry’s program.  Although we are not unsympathetic to the positive changes
made by Father before trial, our paramount concern is what the evidence shows
is best for the children.  Accordingly, we conclude and hold that a factfinder
could reasonably form a firm conviction or belief that termination was in the
best interest of all five children and that the evidence is thus factually
sufficient in that regard.

IV. 
Conclusion

          We
overrule Father’s sole issue, and we affirm the trial court’s judgment.

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; MCCOY and GABRIEL, JJ.

 

DELIVERED: June 23, 2011








 









[1]See Tex. R. App. P. 47.4.





[2]Mother signed an affidavit
of relinquishment and has not appealed the order terminating her rights to all
five children.





[3]Because Father challenges
the factual sufficiency of the evidence, we will review the background facts in
the analysis of that issue.





[4]These are public lands
managed by the United States Forest Service.





[5]All of the girls are
referred to by pseudonyms in this memorandum opinion.  See Tex. R. App.
P. 9.8(b).





[6]Father and Mother would
not give Caren her ADHD medication even though she did better in school with
it.





[7]According to Father, DARS
is a rehabilitation and job training program.  He did not go because it was in
Fort Worth and he did not have transportation; he also admitted that he had
gotten literature on the program before, and he thought it would not work.





[8]Father admitted that
domestic violence was “an issue in [the] home at that time.”





[9]Caren was still fifteen at
the time of trial.





[10]Caren reported experimenting
with marijuana, alcohol, depressants, and amphetamines between the ages of ten
to fourteen when she was still living with her parents.





[11]A boy in school took the
sewing needle in home economics class; Caren pierced her arm with it and tried
to pierce the boy’s.  His parents were threatening to file assault charges at
the time of trial.





[12]Prior to the removal,
Father’s father had let Karla and Joan live with him while an aunt took Karmen
and Caren, but only for a short period of time.





[13]Father and Mother called
CPS because it was November, and they could not take the children to the lake
in the wintertime; it would be too cold, there was no water, and they could not
bathe as they had in the summertime.  Plus, the children had to go to school,
and there was no bus service at the lake.





[14]Although it is somewhat
unclear from the record, this incident appears to have occurred after the
children were placed in foster care.





[15]According to Father, he
stopped going to counseling because he wanted to transfer to MHMR counseling
closer to where he was living with his father; MHMR was slow about getting him
into their program, and when they finally did, his father had died, and Father
was busy handling arrangements.





[16]Patterson said that even
though some of the services were not located in Bowie or Decatur when Father
was living there, she offered to transport him anywhere he needed to go on
twenty-four hours’ notice.





[17]Father testified that he
was going to divorce Mother after he was finished with the ministry’s program
even though one of the ministry’s goals was family and marital reconciliation.